# Exhibit A

Clerk of the Superior Court
*** Electronically Filed ***
M. Bouise, Deputy
8/12/2020 5:08:00 PM
Filing ID 11902535

# JACKSONWHITE
## ATTORNEYS AT LAW
### A Professional Corporation

40 North Center, Suite 200
Mesa, Arizona 85201
T: (480) 464-1111 F: (480) 464-5692
Attorneys for Plaintiff
Email: centraldocket@jacksonwhitelaw.com
By:    Michael R. Pruitt, No. 011792
       mpruitt@jacksonwhitelaw.com
       Nathaniel Hill, No. 028151
       nhill@jacksonwhitelaw.com
       Grant S. Cragun, No. 034332
       gcragun@jacksonwhitelaw.com

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| **Kimberley Nicolini;**<br><br>         Plaintiff,<br>vs.<br><br>**Arizona Board of Regents**, a political subdivision of the State of Arizona operating the University of Arizona;<br>**Kimberly Patten** as Director of Research Development Services, University of Arizona and in her personal capacity and **John Doe Patten** as husband and wife;<br>**Robin Richards, Ph.D.,** as Senior Associate Research Development Services, University of Arizona and in his personal capacity and **Jane Doe Richards** as husband and wife; and **Kim Ogden, Ph.D.,** as Interim Vice President for Research, University of Arizona and in her personal capacity and **John Doe Ogden** as husband and wife,<br><br>         Defendants. | Case No.: CV2020-093360<br><br>**FIRST AMENDED COMPLAINT**<br><br>**(Jury Trial Requested)** |

-1-

Plaintiff, Kimberley Nicolini, ("Ms. Nicolini" or "Plaintiff"), by and through her counsel undersigned, and for her First Amended Complaint, alleges as follows:

## JURISDICTION AND VENUE

1.     This action arises under various state and federal statutes including the Arizona Civil Rights Act ("ACRA"), Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), the Americans with Disabilities Act ("ADA"), the Americans with Disabilities Act Ámendments Act of 2008 ("ADAAA") and the Family and Medical Leave Act ("FMLA").

2.     The Arizona Board of Regents ("ABOR") business office is located in Phoenix, Arizona within Maricopa County.

3.     Jurisdiction and venue are proper for this Court.

## PARTIES

4.     Defendant, ABOR, was created by Arizona statute to govern, administer and control the three public universities in the State of Arizona. Among these universities is the University of Arizona ("U of A") located in Tucson, Arizona. The ABOR serves as the governing board for the U of A.

5.     As an agency of ABOR and recipient of government education funds and other monies, grants and funding, the U of A is required to comply with state and federal anti-discrimination laws.

6.     The U of A operates and maintains a department known as Research Development Services ("RDS"). Among other things, the purpose of RDS is to identify, facilitate and obtain grants and funding for U of A staff, researchers, faculty, projects and programs.

7.     Plaintiff Kimberley Nicolini is a former Research Development Associate ("RDA") for RDS. Her duties consisted primarily of working to obtain grants and funding for social services and arts and humanities faculty, projects and programs. As described herein, Ms. Nicolini's employment with the U of A ended on September 17, 2019 when her employment contract was not renewed due to illegal discrimination and retaliation.

8.     During some of the relevant period, and at the time of the discriminatory and retaliatory nonrenewal of Ms. Nicolini's employment contract, Defendant Kim Ogden, Ph.D., served as Interim Vice President of Research for the U of A with oversight and management of RDS.

9.     Defendants Kim Ogden, Ph.D. and John Doe Ogden are husband and wife. At all relevant times, they were residents of the State of Arizona.

10.     The actions alleged in this First Amended Complaint against Defendant Kim Ogden were performed on behalf of and for the benefit of the marital community of Kim and John Doe Ogden rendering their marital community liable for those actions.

11.     During the relevant time period, Defendant Kimberly Patten served as Director of U of A's RDS. As such, she had direct oversight and managed RDS. During some of the relevant time period, Defendant Patten reported to Defendant Ogden and was socially active with Defendant Ogden.

12.     On information and belief, Defendants Kimberley Patten and John Doe Patten are husband and wife. At all relevant times, they were residents of the State of Arizona.

13.     The actions alleged in this First Amended Complaint against Defendant Kimberly Patten were performed on behalf of and for the benefit of the marital community of Kimberly and John Doe Patten rendering their marital community liable for those actions.

14.     During the relevant time period, Defendant Robin Richards, Ph.D., held the title of Senior Associate RDS. During the relevant time period, Defendant Richards reported directly to Defendant Patten.

15.     During the relevant time period Ms. Nicolini officially reported directly to Defendant Richards. However, despite being the indirect supervisor of Ms. Nicolini, Defendant Patten was intimately involved in the day-to-day supervision and management of Ms. Nicolini. For example, Defendant Patten and Ms. Nicolini often exchanged work related emails directly with Defendant Richards either not included or only copied in the

cc field. Defendant Richards rarely sent work related emails to Ms. Nicolini without at least including Defendant Patten in the cc field. Defendant Patten was heavily involved in the day-to-day supervision and management of Ms. Nicolini.

16.     On information and belief, Defendants Robin Richards, Ph.D., and Jane Doe Richards are husband and wife. At all relevant times, they were residents of the State of Arizona.

17.     The actions alleged in this First Amended Complaint against Defendant Robin Richards were performed on behalf of and for the benefit of the marital community of Robin and Jane Doe Richards rendering their marital community liable for those actions.

## FACTUAL BASIS FOR CLAIMS FOR RELIEF

18.     Ms. Nicolini has a long term diagnosis of suffering from Post-Traumatic Stress Disorder ("PTSD") and Complex Post Traumatic Stress Disorder (CPTSD") due to years of sexual and physical abuse prior to the age of 19.

19.     Ms. Nicolini's PTSD and CPTSD qualify as serious medical conditions under the FMLA.

20.     Ms. Nicolini's PTSD and CPTSD are recognized as disabilities under the ADA, ADAAA, the Rehabilitation Act of 1973 and by the Arizona Civil Rights Act ("ACRA"). Her disability impacts multiple major life activities including brain functions, the ability to regulate emotions, communication, work, sleep, caring for self, interacting with others, and concentration.

21.     At all times material, Ms. Nicolini was a qualified individual and covered employee under the ADA, ADAAA, the Rehabilitation Act of 1973 and the ACRA. At all times material, the U of A and ABOR was the covered employer of Ms. Nicolini as defined by the ADA, ADAAA, the Rehabilitation Act of 1973 and the ACRA. In addition, the U of A and ABOR were engaged in a program or activity as defined by the Rehabilitation Act of 1973. As such, Ms. Nicolini was covered by the provisions of the ADA, ADAAA, Rehabilitation Act of 1973 and the ACRA and entitled to all of the

protections and prohibitions against discrimination, harassment and retaliation contained in those statutes.

22.     Ms. Nicolini was employed at the U of A for almost 19 years. As a Research Development Associate, Ms. Nicolini worked under a series of Notices of Appointment and Notices of Reappointment that are defined by ABOR and the U of A as one year employment contracts. Ms. Nicolini has a long history of having her employment contract routinely renewed.

23.     On October 7, 2015, Ms. Nicolini received a Notice of Appointment from the President of the U of A stating that her employment contract would run from October 5, 2015 through June 30, 2016. On July 5, 2016, Ms. Nicolini received a Notice of Reappointment from the President of the U of A that stated her employment contract would run from July 1, 2016 through June 30, 2017. On July 5, 2017, Ms. Nicolini received a Notice of Reappointment from the President of the U of A that stated her employment contract would run from July 1, 2017 through June 30, 2018. On June 21, 2018, Ms. Nicolini was given a Notice of Reappointment from the U of A President that stated her employment contract would run from July 1, 2018 through June 30, 2019.

24.     Each of these notices and employment contracts specifically invoked the provisions and protections from discrimination found in the ABOR Policy Manual, Policies 6-301 and 6-303. These contractual provisions and protections also include complaint procedures for nonrenewal of the employment contract due to unlawful discrimination. The employment contract also invokes the provisions of Chapter 4 of the University Handbook for Appointed Personnel (UHAP).

25.     As an employee of ABOR and U of A, Ms. Nicolini was also covered by the grievance procedures, protections, and provisions against discrimination, harassment and retaliation, contained in the policies and procedures of ABOR and the U of A.

26.     Despite having PTSD and CPTSD, Ms. Nicolini was able to perform her essential job duties with or without a reasonable accommodation. Evidence of this is found in her superior performance reviews and a public statement by the U of A on its

website, since removed, that Ms. Nicolini's "endeavors have contributed to generating nearly $100 million dollars in peer-reviewed funding for UA."

27.    In her performance review from June 2017, Ms. Nicolini's supervisor stated that Ms. Nicolini's "strengths include both cross-functional support and skills that are relevant to building new partnerships and strengthening established partnerships. These strengths have made [Ms. Nicolini] an effective supporter of disciplinary partnerships . . . [Ms. Nicolini's] strengths thus benefit both RDI and the wider university landscape."

28.    In her performance review dated June 4, 2018, Dr. Robin Richards stated that "Kim had completed all three performance goals for FY2018 in an intellectually demanding and diverse role." Defendant Richards also described Ms. Nicolini as the "unit expert" in social sciences and arts and humanities funding and that she provided "a unique and invaluable skillset to RDS."

29.    Prior to August 2018, Ms. Nicolini did not inform the U of A or her direct or indirect supervisors of her long-standing mental health disability.

30.    At that time, Ms. Nicolini was treated as a valuable member of the team.

31.    On July 20, 2018, Ms. Nicolini informed Defendant Patten and Defendant Richards via email that she would be working from home due to computer problems but would come into the office in the afternoon.   Defendant Richards responded, "No problem. Sorry about the computer problems . . . Why are you coming in this afternoon? Do you have a meeting? Otherwise, why not just work at home all day?"  This helpful, understanding attitude was common prior to August 31, 2018.

32.    On July 24, 2018, Ms. Nicolini informed Defendant Patten and Defendant Richards via email that she would be coming into the office later that morning after she finished a proposal review.  Defendant Richards had no objection, replying "OK. Thanks for letting us know." Defendant Patten did not reply, tacitly approving Ms. Nicolini's actions.

33.    On August 9, 2018, Ms. Nicolini informed Defendant Richards via email that she supported two of the three U of A wins for the National Endowment for the

Humanities ("NEH"), one for $350,000, to which Defendant Richards approvingly replied, "Fantastic. Congratulations!"

34.    On August 13, 2018, in an email titled, "Wow!", Defendant Richards sent an email to Ms. Nicolini informing her that a proposal she oversaw was funded for $400,001, stating, "Big Congratulations?"

35.    On August 23, 2018, Ms. Nicolini informed Defendant Richards via email that she was not feeling well and requested that she work half of her day at home. Defendant Richards responded, "Certainly. Great news that you are feeling somewhat better. Take it easy and pace yourself." On August 28, 2018, when Ms. Nicolini again asked Defendant Richards if she could work from home, Defendant Richards replied, "Certainly!"

36.    In a highly traumatic incident on or about August 31, 2018, Ms. Nicolini discovered the lifeless body of her mother under extremely disturbing circumstances. As a result, Ms. Nicolini took approved FMLA leave due to "severe anxiety and exacerbation of PTSD" and the need to undergo psychotherapy and weekly counseling sessions.

37.    On August 31, 2018, Defendant Richards emailed Ms. Nicolini and stated, "I am really sorry that your Mum passed away today. I hope you can find strength in positive memories of you (sic) Mum, and in the support of your family and friends. Take care, rest well, and stay healthy."

38.    On September 5, 2018, Ms. Nicolini informed Defendant Richards via email that she had "been in shock these past days and not sleeping. Tonight the wall came down and am (sic) in bad shape. Will write tomorrow. Take care." Ms. Richards responded, "I recommend you focus on your health and well-being today and use a bereavement day. Please do not come to the office today, or worry about work this week, as all is covered."

39.    On September 7, 2018, Defendant Richards emailed Ms. Nicolini and told her, "Please stay focused on your health and well-being as you recover from the shock and grief. As you know, you have [Defendant Patten]'s and my full support."

40.     On September 11, 2018, Defendant Patten emailed Ms. Nicolini and informed her that she may be eligible for relief under the FMLA, and Ms. Nicolini subsequently availed herself of FMLA leave.

41.     On October 12, 2018, Defendant Roberts informed Defendant Ogden, John Mester, and Defendant Patten that Ms. Nicolini supported the preparation of a proposal that was awarded $500,000.

42.     Some time on or about the end of November 2018, Ms. Nicolini exhausted her available FMLA leave.

43.     The FMLA paperwork submitted by Ms. Nicolini to obtain approved leave, and later paperwork requesting reasonable accommodations, put Defendants Patten and Richards on notice that Ms. Nicolini suffered from PTSD.

44.     Ms. Nicolini also personally informed Defendants Patten and Richards that she suffered from PTSD and CPTSD.

45.     Defendants Patten and Richards knew that verbal confrontation, yelling, unwarranted harsh criticism, arguments, aggressive behavior, a hostile working environment, ostracizing and other similar actions would exacerbate Ms. Nicolini's recognized mental health disability.

46.     On the afternoon of Thursday, November 29, 2018, Ms. Nicolini met with her direct supervisor, Defendant Richards, and indirect supervisor, Defendant Patten. The meeting was called to discuss the return to work for Ms. Nicolini. At this time, both Defendants Patten and Richards were fully aware that Ms. Nicolini suffered from a diagnosed mental health disability of PTSD. Without conducting any individualized assessment or exploring the need for a reasonable accommodation to ease her return to work, Defendants Richards and Patten informed Ms. Nicolini that she was expected to return to work full time and be "100%." Ms. Nicolini was also told there would be no further opportunity to obtain additional leave after returning to work. At the meeting it was decided that Ms. Nicolini would wait an additional two weeks to return to work and

that Ms. Nicolini needed to provide a note from her medical provider discussing her return to work.

47. Defendants Patten and Richards began an escalating pattern of subjecting Ms. Nicolini to discriminatory harassment, derogatory comments, intimidation, harsh unwarranted criticism, isolation, a hostile work environment, unreasonable deadlines, and actions designed to set up Ms. Nicolini for failure.

48. At 9:08 a.m. on Monday, December 3, 2018, Defendant Richards sent a message to Ms. Nicolini marked as "urgent" that said Ms. Nicolini should "**provide us with the letter this afternoon at the latest**." [Emphasis in original.] This deadline was unreasonable and designed to harass, intimidate and interfere with Ms. Nicolini obtaining a reasonable accommodation.

49. Ms. Nicolini's therapist was out of the office and Ms. Nicolini was not able to provide the note by the stated deadline. Defendant Patten expressed her displeasure to Ms. Nicolini regarding this alleged delay and failure to comply with the unreasonable deadline. When the therapist returned to the office, Ms. Nicolini immediately obtained the required note and provided it to Defendant Richards. Instead of congratulating Ms. Nicolini on her diligent efforts to obtain the note, Defendant Richards stated that the Ms. Nicolini's failure to comply with the unreasonable deadline could be construed as job abandonment.

50. Defendants Patten and Richards continued to pressure Ms. Nicolini to make quick decisions and return to work despite not having fully recovered from her earlier trauma. Sometime on or about December 13, 2018, Defendant Richards stated that he did not want to hear anything further from Ms. Nicolini regarding her tragic events and directed her to not discuss the matter further with her coworkers. This cruel directive served to further isolate Ms. Nicolini and prevent her from receiving sympathy and emotional support from her friends and peers.

51. On the morning of December 18, 2018, Ms. Nicolini informed Defendant Patten that she was working with her primary care physician and would be submitting

forms through the Disability Resource Center (DRC) to request a reasonable accommodation.

52.    The DRC web page on the U of A website states:[1]

> The Disability Resource Center (DRC) is the office designated by the University of Arizona to provide services, resources, and programs to facilitate equal learning and working opportunities for disabled faculty, staff, students, and guests of the University. The DRC also determines whether individuals are eligible for reasonable accommodation and, if so, the nature of the reasonable accommodation.

The DRC is also the organization within the U of A responsible to ensure compliance with the ADA and Section 504 of the Rehabilitation Act of 1973.

53.    Upon returning to work, in contrast to non-disabled similarly situated individuals, Ms. Nicolini was harassed, isolated, and made to feel unwelcomed and no longer a part of the team. Ms. Nicolini was under constant scrutiny, subjected to harsh unwarranted criticism, and given a new set of assignments, work rules and increasingly difficult goals that were designed to make her fail. This hostile work environment would only intensify and had a very negative impact on Ms. Nicolini, both mentally and physically.

54.    One example is that while other Research Development Associates had Defendant Richards' and Defendant Patten's cell phone numbers, they both refused to give Ms. Nicolini their cell phone numbers, complicating Ms. Nicolini's ability to communicate with each of them.

55.    In a letter to Ms. Nicolini dated January 7, 2019, and copied to Defendants Patten and Richards, DRC informed Ms. Nicolini that after engaging in the interactive process it had determined that Ms. Nicolini was eligible for a reasonable accommodation. This approved reasonable accommodation consisted of an eight-week period with a flexible work schedule. This accommodation also included the ability to take short breaks during the day, time off for a standing medical appointments on Thursdays, late morning

---

[1] https://drc.arizona.edu/about/ada504-compliance last accessed August 10, 2020.

arrival of 10 a.m. one or two times per week, and the ability to work late or take sick leave to make up for time off during the day. A reevaluation of this approved accommodation was scheduled for around March 4, 2019.

56.     On January 9, 2019, after Ms. Nicolini informed Defendant Richards that another one of her proposals had been funded, Defendant Richards simply replied, "Great." This is in stark contrast to the praise Ms. Nicolini received from Defendant Richards prior to the August 31, 2018 incident involving the death of Ms. Nicolini's mother.

57.     On or around January 13, 2019, Defendant Patten presented a new process for periodic telework at a staff meeting. Ms. Nicolini asked Defendant Patten if she should complete the form so she could telework. Defendant Patten responded, "No, you have to earn that privilege," even though Ms. Nicolini had teleworked for years. Other employees were granted the right to telework. Ms. Nicolini forwarded the email exchange with Defendant Patten and asked DRC if there was a different set of rules for her.

58.     On January 15, 2019, Ms. Nicolini informed Defendant Richards and Defendant Patten that she would be in the office later in the morning, but that she was working from home, all due to the stress she was dealing with regarding her mother's estate. Despite the reasonable accommodation she received for late morning arrival and for a flexible work schedule, Defendant Patten told Ms. Nicolini, "I would ask though, that if you are not fit to be in the office to work, that you please not work (even remotely). As we've discussed, this work requires that we be on point."

59.     Moreover, on January 15, 2019, Defendant Richards responded to Ms. Nicolini's email as follows: "If you are able to work then why are you not sitting at your cubicle desk right now? You working at home is <u>not</u> part of the eight-week trial and your request for reasonable accommodation. To quote from the DRC letter: 'You requested informal daily flexibility to enable to you to take short breaks during your workday, to attend a weekly medical appointment and, when needed, to have **a morning arrival time as late as 10:00 a.m. with extended worktime in the evening to makeup a full work**

**day**. My understanding from our conversation is that you need to take breaks and to have a delayed morning start time will be periodic. . . ." [Emphasis in original].

60.   When Ms. Nicolini responded by requesting a meeting between Defendant Richards, Defendant Patten, and Lori Van Buggenum, assistant director of the DRC, to determine the scope of the reasonable accommodation, Defendant Richards callously responded by only stating, "I quoted from Lori's letter in my email below." Additionally, Defendant Patten responded by stating, "No, I'd like to talk to you first and then if needed, we talk to Lori." Defendant Roberts and Defendant Patten effectively bullied Ms. Nicolini into limiting her reasonable accommodation and forcefully discouraged her from contacting the DRC for further clarification and guidance on her reasonable accommodation.  Defendants Patten and Richards adversely impacted Ms. Nicolini's accommodation efforts (1) by banning Ms. Nicolini from any teleworking, (2) by manipulating the interactive process to prohibit Ms. Nicolini from meeting with Defendants and DRC as she requested, and (3) by adding no teleworking as a revised accommodation without consulting Ms. Nicolini.

61.   These email exchanges were so triggering of Ms. Nicolini's PTSD that she felt compelled to reach out to Ms. Van Buggenum to report these hostile emails from Defendant Richards.  Even after clarification from DRC, Defendants Patten and Richards continued to not honor accommodations and harassed Ms. Nicolini.

62.   On January 23, 2019, after Ms. Nicolini had copied Defendant Patten on several emails involving working with a certain faculty member that Defendant Patten had repeatedly discussed with Ms. Nicolini, Defendant Patten asked to be removed from the email chain once it was shown that Ms. Nicolini had made extensive progress in meeting with that faculty member.  Specifically, Defendant Patten's email stated, "Thanks for following up, do you mind dropping me from the email chain moving on? Trying to manage my inbox."

63.   On January 24, 2019, Defendant Richards sent a terse email to Ms. Nicolini, stating, "Its (sic) 9:10 and you are not at your desk. Are you starting late today?" Ms.

Nicolini responded soon after that she was at home responding to a time sensitive email from a faculty member and that she would be arriving at the office shortly. It was standard practice for RDAs to respond to emails in the morning before coming into the office.

64.    On January 29, 2019, when Ms. Nicolini informed Defendant Richards that she had received very positive feedback from the PIs she was working with, Defendant Richards only responded by stating, "Which PIs?" This is a stark contrast from the former positive reinforcement that Defendant Richards had given to Ms. Nicolini.

65.    On January 29, 2019, Ms. Nicolini informed Defendant Richards that she would be in later in the morning and that she was hopeful to soon resolve legal issues surrounding her mother's house that had been effecting her CPTSD. Instead of expressing any positive reaction to a major stressor of Ms. Nicolini being resolved, Defendant Richards simply stated, "Thanks for the email." After Ms. Nicolini sent a follow up about running a bit later because she needed to stop by the doctor, and expressing to Defendant Richards her desire not to cause any disruptions, Defendant Richards again tersely responded, "Thanks for the update." These cold, callous responses were part of a pattern of creating and maintaining a hostile work environment against Ms. Nicolini.

66.    On January 31, 2019, Ms. Nicolini sent another email to Defendant Richards regarding the legal issues surrounding her mother's house and estate. Defendant Richards again gave a terse response, "Thanks for the update. Drive safely."

67.    In close temporal proximity to receiving the approved reasonable accommodation and flexible workweek, the hostile discriminatory work environment Ms. Nicolini endured intensified. Defendant Richards and Defendant Patten continued making derogatory comments and engaged in systematic harassment of Ms. Nicolini involving her recognized disability and request for a reasonable accommodation.

68.    Ms. Nicolini subsequently engaged in protected activity and complained to DRC about the hostile work environment to which she was being subjected. Ms. Nicolini also complained to her supervisor, Defendant Richards. These complaints to DRC and

Defendant Richards did not result in any improvement in the working conditions of Ms. Nicolini.

69.     On February 8, 2019, Ms. Nicolini informed Defendant Patten and Defendant Richards that she was requesting a temporary accommodation of a reduced schedule to address finishing her responsibilities regarding her mother's estate, all tied into her CPTSD.  Despite Ms. Nicolini informing Defendant Patten and Defendant Richards that her request was temporary and not permanent, Defendant Patten and Defendant Richards would go on to permanently reduce Ms. Nicolini's work week schedule, an intentional move to decrease Ms. Nicolini's income, isolate her, and soon after terminate her.

70.     On February 14, Ms. Nicolini sent an email to Defendant Patten and Defendant Richards informing them that another one of the NEA proposals she supported was funded.  The only response she received was a chastising message about contacting U of A public relations.

71.     On or about February 15, 2019, Ms. Nicolini was on campus to conduct a National Endowment for the Humanities workshop for faculty members. A technical issue prevented use of the Zoom videoconference software. Ms. Nicolini and the other presenters scrambled to resolve the problem and provide meaningful information without the video conference resources they had intended to use during the workshop. When Defendant Patten looked in on the workshop, she saw that the Zoom software was not being used. After the workshop was over, despite knowing that Ms. Nicolini suffered from PTSD or asking why the Zoom software was not used, Defendant Patten began waiving her arms and yelling at Ms. Nicolini falsely claiming she was "fully unprepared" for the workshop. This harassment occurred across a public area in front of Ms. Nicolini's peers and fellow employees.

72.     Knowing that Ms. Nicolini suffers from PTSD, the deliberate, willful and intentional conduct of yelling at Ms. Nicolini was designed to harass, traumatize and

inflict severe emotional distress on Ms. Nicolini. This event proved so devastating that Ms. Nicolini was forced to take time off work.

73.   On February 15, 2019, after receiving the unwarranted, harsh criticism from Defendant Patten, Ms. Nicolini wrote the following email to Defendant Richards:

> I can't help but feel after today that I am not wanted at RDS, and my services are not valued. I felt that [Defendant Patten] made assumptions that were not fair and that she is looking for any reason to discredit my work. I would appreciate a fair response. At this moment, I am fairly sure that she wants me out. I have support of faculty on campus. They are happy I am back. I could find another place or way to help them if RDS sees me as a hindrance. But I would appreciate direct communication. In the meanwhile, I will do the best I can to find a way to move to other pastures since it's fairly clear that something has happened to make [Defendant Patten] (and you?) question my professional ability. All things considered, I think I have done an outstanding job of getting back on my feet, and the faculty are truly appreciative of my efforts. It's unfortunate that I am not perceived in that capacity here in RDS. If my thinking is not correct, do let me know. But given how [Defendant Patten] responded to me today, treated me, talked to me in public, and corresponded with me, I have to accept that she has little to no respect for the value of my work.

This was the first of several written and verbal complaints to Defendant Richards relating to Ms. Nicolini's unfair and discriminatory treatment by Defendant Patten. Defendant Richards, per U of A policy, should have reported these complaints to the Office of Institutional Equity (OIE), but he failed to do so.

74.   On February 22, 2019 at 9:27 AM, when Ms. Nicolini informed Defendant Patten and Defendant Richards that she was finishing up a proposal and was on her way into the office, Defendant Richards responded, "Thanks for the email." Defendant Patten responded in part, "Lori Van Buggenum wrote on 1/16/2019 clarifying that the informal daily flexibility accommodation did not include working remotely. Please plan to be in the office to work."

75.   Ms. Nicolini learned that the discriminatory and harassing treatment she received from Defendant Patten was a common topic of discussion among other

employees. Defendant Patten was also overheard making defamatory and disparaging comments about Ms. Nicolini and her disability to other faculty members and U of A leadership.

76.     On March 6, 2019, DRC sent a letter to Ms. Nicolini, copied to Defendant Patten and Defendant Richards, indicating that a new reasonable accommodation had been approved for Ms. Nicolini allowing a reduced workweek of 24 hours through May 1, 2019.

77.     On March 27, 2019, Ms. Nicolini sent an email to Defendant Richards titled "i'm (sic) really depressed about work situation" that stated as follows:

> I don't know what to do. I can't be here after all the stuff with [Defendant Patten] and now everyone looking at me. I just need to get out. I'm so depressed. It was not okay for her to treat me like that, and now I feel hopeless. I'm just letting you know. I will try to figure it out."

78.     By the end of March, Ms. Nicolini had achieved all of the goals set for her by Defendant Patten, and Defendant Richards acknowledged that she had achieved her goals.  In violation of U of A policy, Defendants Patten and Richards never reviewed Ms. Nicolini's performance in relation to her goals.

79.     On April 3, 2019, Ms. Nicolini emailed Defendant Patten and Defendant Richards regarding necessary aspects of a project that was approaching the NEH fellowship deadline.  In response to this email, Defendant Richards stated, "You are supposed to not be working today. ☺" to which Ms. Nicolini responded, "I told [Defendant Patten] I have to because of NEH fellowship deadline but with the house and everything else it will work out. She was fine with that."

80.     On April 15, 2019, Ms. Nicolini was involved in a serious car accident that sent her to the hospital and required her to take some additional time off work. That same day, Defendant Richards requested that Ms. Nicolini send draft documents related to performance evaluations by April 18, 2019.

81.     On April 17, 2019, two days after Ms. Nicolini's serious car accident, Defendant Patten scheduled a meeting with Ms. Nicolini. Despite Ms. Nicolini's full

compliance with her 2019 goals, Defendant Patten at this meeting gave Ms. Nicolini all new goals which were significantly different from her previous goals that she was fully meeting and accomplishing. Also during this meeting, without engaging in the interactive process or soliciting input from Ms. Nicolini, her medical providers, or the DRC, Defendant Patten stated that Ms. Nicolini needed to request a reasonable accommodation of working entirely from home. This was done after Defendant Patten told Ms. Nicolini for months that she had not "earned the privilege" to work from home. Defendant Patten, acting unilaterally, and without the authorization or approval of Ms. Nicolini, contacted DRC to change Ms. Nicolini's accommodations with the objective of entirely removing Ms. Nicolini from the workplace. Defendant used the auto accident as a pretext to permanently remove Ms. Nicolini from the workplace.

82.     For days, Defendant Patten coerced and bullied Ms. Nicolini to request 100% telework even though Defendant Patten knew Ms. Nicolini was still suffering from the lingering effects of a concussion. Ms. Nicolini succumbed to the pressure and eventually agreed to request she be allowed to telework. Ms. Nicolini began working from home, which was part of Defendants' objective to remove Ms. Nicolini from the workplace, fail to review her performance, and plan not to renew her contract.

83.     The action of Defendant Patten in pressuring Ms. Nicolini to work from home was part of a deliberate effort to further isolate Ms. Nicolini and deprive her of the social interaction she found therapeutic. Her actions deprived Ms. Nicolini from receiving her performance evaluation and was intended to block her from returning to work full-time in May as was originally the plan. These actions further manipulated and interfered with the interactive process to design entirely new and unachievable goals after Ms. Nicolini had met her goals ensuring failure and causing Ms. Nicolini to suffer from tonic immobility.

84.     Of note, the suggested reasonable accommodation removed Ms. Nicolini from supporting faculty, which was her essential job duty.

85.     Despite knowing of the reasonable accommodation of working reduced hours, Defendant Patten assigned Ms. Nicolini a lengthy list of new tasks as part of an on-going effort to set Ms. Nicolini up for failure.

86.     Additionally, that same day, Defendant Richards berated Ms. Nicolini by interrogating her on her alleged lack of biweekly reports and demanding to know when Ms. Nicolini would "be submitting [her] late biweekly report to [Defendant Richards and Defendant Patten.]"

87.     On April 24, 2019, DRC reevaluated and extended the reasonable accommodation of a telework 24-hour workweek through June 3, 2019.

88.     Despite still dealing with CPTSD and the intense pain she experienced from a serious car accident, Defendant Richards showed little sympathy or understanding towards Ms. Nicolini. On April 29, 2019, after Ms. Nicolini informed Defendant Richards of her best efforts to complete assignments, Defendant Richards stated as follows: "Your proposal to make up time this week is not realistic based on last week and the current Accommodation, sorry. The current (brand new) Accommodation is for you to work six-hour days on four days each week by telework, so let's not already make an exception."

89.     On May 25, 2019, Ms. Nicolini informed Defendant Richards that the workload and timeline given by Defendant Patten to Ms. Nicolini is not reasonable to conform with best practices and would result in sloppy work product if Ms. Nicolini was held to Defendant Patten's deadline. Despite Ms. Nicolini only reaching out to Defendant Richards and asking him in confidence how to address these issues with Defendant Patten, Defendant Richards replied to Ms. Nicolini's email and copied Defendant Patten. Defendant Richards then stated as follows: "No one is asking you to do 'sloppy work'. Your telework agreement is for you to work between **noon-6pm** on Monday, Tuesday, Friday, and either Wednesday or Thursday (alternating) each week—not on weekends. Complete what you can, and the three of us will reassess the timeline . . . ." Defendant Richards then tersely stated, "You also committed to providing Kim Patten and me a

weekly update on your progress **each Friday**. Please meet that commitment." [Emphasis in original.]

90.     After this email conversation, Ms. Nicolini reached out to Ms. Van Buggenum that night and expressed her concerns about the unrealistic workload and that she was not in the right state of mind given her concussion and other health issues when she agreed to the plan under the most recent reasonable accommodation.

91.     On Friday, June 14, 2019 Kim Patten scheduled a meeting with Ms. Nicolini and Defendant Richards for Monday, June 17, 2019 to review Ms. Nicolini's work, telling Ms. Nicolini that she had reserved the room with the projector to make it easier to review the work as a team. Ms. Nicolini worked all weekend preparing materials for the meeting believing it was for the stated reason. When she walked into the meeting on June 17, 2019, Defendant Richards handed her a letter of non-renewal, even though Ms. Nicolini was told by DRC that she could not have her contract terminated based on performance and even though Ms. Nicolini had met her goals for the year yet never received a performance evaluation. Defendant Patten cited performance as the reason for the non-renewal.

92.     On Thursday, June 6, 2019, DRC reevaluated and extended the reasonable accommodation of a telework 24-hour workweek through June 28, 2019.

93.     At the time of the June 17, 2019 meeting, Ms. Nicolini was working under an employment contract set to expire on June 30, 2019. At this meeting, Ms. Nicolini was presented with a short letter signed by Defendant Ogden that stated the current service professional appointment of Ms. Nicolini as a Research Development Associate would not be renewed for another fiscal year. Instead, Ms. Nicolini would be offered a short-term appointment for the period of July 1, 2019 through September 17, 2019. Given that Ms. Nicolini was entitled to a 90-day notice of non-renewal of her employment contract, September 17, 2019 falls just after this 90-day period.

94.     Ms. Nicolini was blindsided by this information to such a degree that it triggered a catastrophic CPTSD breakdown. She learned that Defendants did not consult

DRC or any other medical professionals regarding the protocol for handling such a situation; DRC was on vacation for a week and Nicolini would not have anyone to talk to until then; reassignment or transfer was never offered her; and she never received evaluations regarding her disability or her performance. She was so shaken up that she fell down stairs exiting and had to be helped by UAPD. She reported discrimination that day but OIE did not contact her for four days; did not accept the complaint that Ms. Nicolini filed; waited until after Ms. Nicolini was no longer employed to accept and file a complaint; and took over a year to come to an unjust conclusion.

95.    The failure to renew the employment contract for another fiscal year was due to discriminatory and retaliatory animus in violation of ABOR policy and the law.

96.    The failure to renew the employment contract for another fiscal year violated the terms and conditions, including prohibitions against discrimination, in the employment contract of Ms. Nicolini.

97.    On June 27, 2019, DRC extended the reasonable accommodation of a 24-hour workweek for Ms. Nicolini through the end of her short-term employment contract scheduled to end on September 17, 2019.

98.    Even after orchestrating the end of Ms. Nicolini's employment and the non-renewal of her employment contract, the discrimination, retaliation and hostile work environment suffered by Ms. Nicolini did not end.

99.    On or about August 1, 2019, Defendant Ogden privately contacted Ms. Nicolini through Defendant Ogden's personal email account.  The subject line of the email stated "URGENT REQUEST" and cryptically asked, "Available?" Given Ms. Nicolini's PTSD, a condition known to Defendant Ogden, this type of cryptic communication caused Ms. Nicolini to suffer escalating symptoms of her PTSD .

100.    Throughout the rest of the Summer of 2019, Ms. Nicolini kept in frequent touch with her supervisor, Defendant Richards. They discussed her duties and the assignments Ms. Nicolini was working on. For example, on August 14, 2019, Ms. Nicolini sought guidance on what should be her top two or three priorities going forward.

Defendant Richards responded with a list of several documents and templates. Ms. Nicolini informed Ms. Richards that she would concentrate on completing two of the documents he listed. Defendant Richards responded, indicating that was "fine." The exchange of e-mails on August 14, 2019 confirms that Ms. Nicolini intended to continue working and perform her duties. Ms. Nicolini never indicated she intended to stop working or that she had abandoned her job.

101.   The next day, August 15, 2019, Defendant Richards sent an e-mail to Ms. Nicolini stating that he understood that the notice of non-renewal had caused Ms. Nicolini to be upset or ill and falsely claimed that Ms. Nicolini acknowledged she was no longer working or performing any assigned tasks. The email went on to state:

> Because you are not performing any of your assigned tasks and are not on an approved leave **there is a just cause basis for your dismissal**. [Emphasis added.] However, I am sympathetic to your personal circumstances. After consulting with Human Resources, we have determined that the best course of action is to **relieve you of all of your job duties effective August 16, 2019. You will continue to receive your full pay and benefits through September 17, 2019**, as indicated in your Notice of Nonrenewal. [Emphasis in original.]

Defendant Richards requested that Ms. Nicolini return her laptop and other University property and arrange to collect her belongings.  Defendant Richards also falsely informed Ms. Nicolini that she would no longer have access to her email. Following receipt of his email, Ms. Nicolini contacted HR to confirm and forwarded information from UA Employee Handbook to Defendant Richards clarifying that she had access to email for life as a benefit from working for U of A for over 18 years. Defendant Richards (1) falsely represented facts; (2) did not adhere to U of A employment policy; and (3) spoke out of place (information should have come from HR), all to bully Ms. Nicolini and cause her to panic and fear further retaliation.

102.   The unjustified and arbitrary action of instituting a just cause dismissal of Ms. Nicolini violated the contractual due process provisions of ABOR policy 6-303 and

result in a breach of Ms. Nicolini's employment contract and breach of the covenant of good faith and fair dealing inherent in every contract.

103.    RDS maintains a Meet the Team webpage on the University website. Sometime on or before August 21, 2019, the picture and biography of Ms. Nicolini was removed. She was also removed from the RDS directory webpage, compelling evidence that despite an employment contract that continued through September 17, 2019, Ms. Nicolini was no longer part of the team.

104.    In a final act of indignity and harassment, while the employment contract of Ms. Nicolini was still in effect, Defendant Patten directed that Ms. Nicolini be denied access to the building that houses RDS and the office of Ms. Nicolini. Ms. Nicolini has never been disruptive or engaged in threatening behavior and this action serves as a parting shot at Ms. Nicolini and an attempt to impugn and defame her reputation.

105.    The U of A maintains the Office of Institutional Equity ("OIE") to investigate, among other things, complaints of discrimination.

106.    On or about August 27, 2019, while still an employee covered by the contractual terms and conditions of her employment contract, Ms. Nicolini contacted OIE in order to lodge a formal complaint. This formal OIE complaint alleged illegal disability discrimination, retaliation related to engaging in protected activities and receiving a reasonable accommodation, harassment, a hostile work environment, the actions of Defendant Richards and Defendant Patten, and the discriminatory nonrenewal of her employment contract.

107.    Ms. Nicolini's employment with the U of A ended when her contract expired on September 17, 2019.

108.    Ms. Nicolini had previously participated in the Qualitied Tuition Reduction program that provided a significant reduction in the tuition paid by her daughter for attending the U of A. As a result of losing her employment with the U of A, Ms. Nicolini can no longer participate in the Qualified Tuition Reduction program and has lost this significant economic benefit.

109.   A formal Discrimination Complaint Form was drafted by OIE for Ms. Nicolini. The OIE complaint was formally accepted and signed by an OIE representative on October 22, 2019.

110.   On August 3, 2020, Ms. Nicolini received a brief letter from the OIE informing her that the OIE completed its investigation of Ms. Nicolini's discrimination complaint and did not find "sufficient evidence . . . that Ms. Patten or Mr. Richards discriminated against [Ms. Nicolini] on the basis of [her] disability or retaliated against [her]." The letter also states that the OIE does "not find a violation of the University's Nondiscrimination and Anti-harassment Policy." The OIE came to this finding despite the extensive evidence presented by Ms. Nicolini of the harassing and discriminatory behavior of both Defendant Patten and Defendant Richards.

111.   Ms. Nicolini has complied with all prerequisite state and federal statutory requirements for filing this lawsuit, which is timely filed.

112.   Ms. Nicolini has received right-to-sue letters from both the Arizona Attorney General's Office ("AGO") for claims under the ACRA and the Department of Justice ("DOJ") for claims under the ADA.

113.   The actions and events described herein constitute illegal discrimination, harassment and retaliation under the ADA, ADAAA, FMLA, Rehabilitation Act of 1973 and ACRA.

114.   As the direct and proximate result of Defendants intentional conduct and illegal actions, Ms. Nicolini suffered severe emotional distress, nervous breakdown, fear, anxiety, humiliation, social isolation, and insomnia to such an extent that she suffered mental and physical harm.

115.   As a result of the termination of her employment, Ms. Nicolini has suffered significant economic harm through lost income and generous benefits.

//

//

//

## COUNT I

### (Section 504 of the Rehabilitation Act of 1973)

116.    All previous paragraphs of this First Amended Complaint are realleged as if set forth more fully herein.

117.    Section 504 of the Rehabilitation Act, 29 U.S.C.S. § 701 et seq., creates a private right of action for individuals subjected to disability discrimination and retaliation by any program or activity receiving federal educational and other federal financial assistance.

118.    The U of A receives federal education and other federal financial assistance, and all of its programs and activities, including RDS, must comply with the provisions and protections of Section 504 of the Rehabilitation Act.

119.    Ms. Nicolini is a qualified individual who can perform the essential functions of her duties with or without a reasonable accommodation.

120.    The events and actions described herein violated Section 504 of the Rehabilitation Act by discriminating, retaliating and then terminating Ms. Nicolini due to disability discrimination and retaliation.

121.    As described herein, ABOR and U of A acted through its agents and employees and engaged in illegal employment actions including, disability discrimination and retaliation. These actions included the nonrenewal of the employment contract of Ms. Nicolini due to illegal discrimination and retaliation.

122.    This action under Section 504 of the Rehabilitation Act of 1973 is brought against ABOR.

123.    The extreme and outrageous conduct described herein was deliberately calculated to cause Ms. Nicolini severe emotional distress or was so recklessly indifferent to the near certainty that it would cause severe emotional distress that they can be considered intentional.

124.    The effect of these illegal actions has deprived Ms. Nicolini of her employment and caused significant economic harm.

125.   Ms. Nicolini has claims for compensatory damages, lost past and future income, emotional distress, medical bills, other general compensatory damages, and any and all other recovery as provided for by law.

126.   Ms. Nicolini has a claim for injunctive relief including reinstatement with an award of full back pay and all lost benefits, or in the alternative to reinstatement and an award of full back pay and lost all benefits plus front pay and benefits.

127.   Ms. Nicolini has a claim for her reasonable attorneys' fees and costs.

**COUNT II**

**(ADA)**

128.   All previous paragraphs of this First Amended Complaint are realleged as if set forth more fully herein.

129.   Ms. Nicolini brings this claim to enforce the provisions of the ADA against discrimination and retaliation.

130.   The ADA prohibits employment related discrimination and retaliation based on disability.

131.   Ms. Nicolini is a qualified individual who can perform the essential functions of her duties with or without a reasonable accommodation.

132.   Ms. Nicolini has a recognized disability and received an approved reasonable accommodation.

133.   The actions and events described herein constitute illegal discrimination and retaliation in violation of the ADA. As a result, Ms. Nicolini has been damaged and is entitled to all actions and relief as provided for under the ADA.

**COUNT III**

**(FMLA)**

134.   All previous paragraphs of this First Amended Complaint are realleged as if set forth more fully herein.

135.   Ms. Nicolini brings this claim against the Defendants to enforce the provisions of the FMLA against interference and retaliation.

136.    Subsequent to taking approved and protected FMLA leave, Ms. Nicolini suffered illegal interference and retaliation.

137.    The actions and events described herein constitute illegal interference and retaliation in violation of the FMLA. As a result, Ms. Nicolini has been damaged and is entitled to all actions and relief as provided for under the FMLA.

## COUNT IV

### (1983)

138.    All previous paragraphs of this First Amended Complaint are realleged as if set forth more fully herein.

139.    Federal statute 42 U.S.C. § 1983 provides in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

140.    Based on the actions described herein, Defendants are liable to Ms. Nicolini for violations of 42 U.S.C. § 1983.

141.    At all material times, the individual defendants were acting under the color of state law to deprive Ms. Nicolini of her rights, privileges, and immunities as guaranteed by law and the U.S. Constitution.

142.    At the time the illegal and improper actions described herein were performed, it was well known and clearly established that the actions violated the statutory and constitutional rights of Ms. Nicolini. The individual Defendants are not entitled to any absolute or qualified immunity and are liable in both their official and individual capacities.

143.    As described herein, the illegal actions taken against Ms. Nicolini constitute violations of her constitutional rights as guaranteed by the Constitution of the United States.

144.    As described herein, the actions and misconduct of Defendants served to deprive Ms. Nicolini of her procedural and substantive due process rights as guaranteed by law and the United States Constitution.

145.    The improper conduct described herein is arbitrary and capricious and intended to injure Ms. Nicolini without any justifiable government interest and the substantive due process rights of Ms. Nicolini.

146.    The actions described herein, demonstrate harm to reputation, loss of good name and reputation, and a loss of employability that implicate the constitutionally protected liberty interest of Ms. Nicolini and served to deprive her of a protected property interest in continued employment.

147.    Ms. Nicolini has suffered humiliation and degradation, pain and suffering, and economic loss due to the unconstitutional and illegal practices of Defendants

148.    As a result, Defendants are liable to Ms. Nicolini for the violations of her constitutional and statutory rights and privileges entitling her to recover damages and for all other rights, privileges, and remedies, in law or in equity, available to her under 42 U.S.C. § 1983 or other applicable statute.

149.    The actions of the individual Defendants were undertaken with a reckless indifference or callous disregard for the constitutionally and statutorily protected rights and privileges of Ms. Nicolini rendering them liable for punitive damages.

150.    Ms. Nicolini is entitled to recover her reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and all other applicable statutes.

## COUNT V

### (Arizona Civil Rights Act)

151.    All previous paragraphs of this First Amended Complaint are realleged as if set forth more fully herein.

152.    The ACRA prohibits discrimination and retaliation due to disability.

153.    As described herein, ABOR and U of A acted through its agents and employees and engaged in illegal employment actions including, disability discrimination

and retaliation. These actions included the nonrenewal of the employment contract of Ms. Nicolini due to illegal discrimination.

154.   The effect of these illegal actions has deprived Ms. Nicolini of her employment and cause significant economic harm.

155.   Ms. Nicolini has claims for compensatory damages, lost past and future income, medical bills, and any and all other recovery as provided for by law.

156.   Ms. Nicolini has a claim for injunctive relief including reinstatement with an award of full back pay and all lost benefits, or in the alternative to reinstatement an award of full back pay and lost all benefits plus front pay and benefits.

157.   Ms. Nicolini is also entitled to recover her reasonable attorneys' fees and costs.

## COUNT VI

### (Breach of Contract)

158.   All previous paragraphs of this First Amended Complaint are realleged as if set forth more fully herein.

159.   Ms. Nicolini had a valid and enforceable employment contract with ABOR. That contract was not renewed for discriminatory reasons which violated the terms and conditions of that contract.

160.   This employment contract set forth detailed contractual obligations and due process provisions that governed and controlled the employment, just cause termination, and discriminatory nonrenewal of that contract.

161.   As described herein, the actions of ABOR, its agents and employees repeatedly breached the terms and conditions of the employment contract of Ms. Nicolini. As a result, Ms. Nicolini has a claim for breach of contract against ABOR.

162.   While still an employee of ABOR, Ms. Nicolini invoked the contractual grievance procedure and lodged a complaint of discrimination, retaliation and harassment due to disability with the OIE as the department designated for receiving such complaints.

163.   As a direct and proximate cause, Ms. Nicolini has suffered significant economic and other damage. These include substantial lost past and future income and benefits, other economic losses, medical bills, diminished employment prospects, humiliation and degradation, pain and suffering, and severe mental anguish and distress.

164.   Ms. Nicolini has also lost significant employment benefits, including medical insurance, reduced tuition for her daughter, reduced pension and retirement benefits, seniority, Social Security benefits, insurance coverage, bonuses and other monetary and nonmonetary benefits.

165.   As a result of this breach and wrongful conduct, Ms. Nicolini seeks all compensatory, consequential and incidental damages available to her in an amount to be proven at trial.

166.   Because this claim arises from breach of contract, Ms. Nicolini is entitled to recover her reasonable attorney's fees pursuant to A.R.S. § 12-341.01(A).

## COUNT VII

### (Breach of the Covenant of Good Faith and Fair Dealing)

167.   All previous paragraphs of this First Amended Complaint are realleged as if set forth more fully herein.

168.   The covenant of good faith and fair dealing is implied in every contract.

169.   Ms. Nicolini had a valid and enforceable employment contract with ABOR. That contract was not renewed for discriminatory reasons which violated the terms and conditions of that contract.

170.   The actions and conduct of Defendants constituted bad faith and a breach of the implied covenant of good faith and fair dealing and as a result Ms. Nicolini was wrongfully deprived of the rights and benefits available to her under that contract.

171.   As a result, Ms. Nicolini suffered significant economic and other damage.

172.   As a direct and proximate result of this breach and bad faith, Ms. Nicolini has suffered loss of reputation, diminished employment prospects, economic losses, humiliation and degradation, pain and suffering and severe mental anguish and distress.

She has suffered significant loss of income in the form of past, present and future wages and savings. Ms. Nicolini has also lost significant employment benefits, generous pension and retirement benefits, seniority, Social Security benefits, insurance coverage, bonuses and other monetary and nonmonetary benefits.

173.    As a result of this breach and bad faith, Ms. Nicolini seeks all compensatory, consequential and incidental damages available to her in an amount to be proven at trial.

174.    Because this claim arises under contract, Ms. Nicolini is entitled to recover her reasonable attorneys' fees pursuant to A.R.S. § 12-341.01(A).

## COUNT VIII

### (Intentional Infliction of Emotional Distress)

175.    All previous paragraphs of this First Amended Complaint are realleged as if set forth more fully herein.

176.    ABOR and the U of A are responsible for the illegal, extreme and outrageous conduct of its agents and employees.

177.    The illegal, extreme and outrageous conduct described herein was intended to cause Ms. Nicolini severe emotional distress or was so recklessly indifferent to the near certainty that it would cause severe emotional distress that it can be considered intentional.

178.    As a result, Ms. Nicolini suffered severe and debilitating emotional distress, panic attacks, humiliation, degradation, harm to her good name and reputation, severe anxiety, stress, trauma, and fear of lost income and benefits.

179.    The emotional distress suffered by Ms. Nicolini was so extreme and severe that it manifested itself in physical symptoms.

180.    As a result, Ms. Nicolini is entitled to recover damages for her intentional infliction of emotional distress claim.

//

//

**WHEREFORE,** Plaintiff respectfully requests judgment in her favor and against Defendants and that the Court declare as follows:

A. That the employment practices and actions described herein are unlawful and violate the ACRA, Section 504 of the Rehabilitation Act of 1973, the ADA and ADAAA, and the FMLA;

B. Award Ms. Nicolini any and all relief and recovery available to her under the ACRA, Section 504 of the Rehabilitation Act of 1973, the ADA and ADAAA, and the FMLA;

C. Award all lost past and future income, lost benefits, diminished retirement benefits, medical bill, and all other economic damages in an amount to be determined at trial;

D. Award all compensatory damages to which Plaintiff is entitled including but not limited to, pain and suffering, mental anguish, loss of earning capacity in an amount to be proven at trial;

E. Order the individual Defendants to pay Ms. Nicolini punitive damages sufficient to punish their actions and deter similar conduct in the future;

F. Order Defendants to pay Ms. Nicolini's court costs, expenses, and reasonable attorneys' fees;

G. Award prejudgment interest from the date each claim for damages was liquidated;

H. Award interest on all sums awarded in judgment at the highest legal rate allowable from the date of judgment until paid;

I. That this Court retain jurisdiction over this action to ensure full compliance with the Court's orders and require Defendants to file such reports as the Court deems necessary to evaluate such compliance; and

J. For such other and further relief as this Court deems just and proper under the circumstances.

**DATED** this 12th day of August, 2020.

**JACKSON WHITE**

 s/ Michael R. Pruitt 
By: Michael R. Pruitt, No. 011792
Nathaniel Hill, No. 028151
Grant Cragun, No. 034322
40 North Center Street, Suite 200
Mesa, Arizona 85201
Attorneys for Plaintiff

**ORIGINAL** of the foregoing filed with the Clerk
of the Court this 12th day of August, 2020.