**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kimberley Nicolini,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>Arizona Board of Regents, et al.,<br><br>　　　　　Defendants. | No. CV-20-01798-PHX-GMS<br><br>**ORDER** |

Pending before the Court is Defendants Arizona Board of Regents ("ABOR"), Kimberly Patten, Robin Richards, Kim Ogden, in their official and personal capacities, and their respective spouses' (collectively, "Defendants") Motion to Dismiss, (Doc. 15), and the parties' Stipulation to Dismiss with Prejudice Plaintiff's FMLA Retaliation Claim under Count III and Fourteenth Amendment Claim under Count IV, (Doc. 14). For the following reasons, the stipulation is granted and Defendants' Motion to Dismiss is granted in part and denied in part.[1]

**BACKGROUND**

Plaintiff Kimberley Nicolini ("Nicolini") is a former Research Development Associate for the University of Arizona's ("U of A") Research Development Services ("RDS") department. (Doc. 11 ¶¶ 6–7, 10–11.) RDS is part of the U of A's Research, Discovery & Innovation ("RDI") department. *Id.* ¶ 7. Defendant ABOR is the governing

---

[1] The Court held oral argument on April 2, 2021. (Doc. 21.)

board responsible for overseeing the U of A. *Id.* ¶ 4. While working for the U of A, Nicolini's colleagues included Defendants Patten, Richards, and Ogden. During the period at issue, Ogden served as Interim Vice President of Research for RDI, Patten served as Director of Research Development Services ("RDS"), and Richards served as Senior Associate of RDS and was Nicolini's direct supervisor. *Id.* ¶¶ 14–21.

While employed at the U of A as a Research Development Associate, Nicolini worked under a Notice of Appointment ("NOA"), which is an employment contract that typically lasts for one year. *Id.* ¶ 32. On June 22, 2018, Nicolini accepted an NOA for July 1, 2018 through June 30, 2019. *Id.* ¶ 33. On August 31, 2018, while under this NOA, Nicolini experienced a traumatic incident that exacerbated her diagnosed Post-Traumatic Stress Disorder ("PTSD") and Complex Post-Traumatic Stress Disorder ("CPTSD"). *Id.* ¶¶ 25, 94. Nicolini subsequently took approved leave under the Family Medical Leave Act ("FMLA") and additional approved leave afterwards. *Id.* ¶¶ 94, 108. Nicolini alleges that, after taking leave, she experienced various forms of discrimination from Defendants. Nicolini alleges that this discrimination culminated in the non-renewal of her appointment for another fiscal year on June 17, 2019. *Id.* ¶¶ 34, 211, 214. Instead, Nicolini was offered a short-term appointment for July 1, 2019 through September 17, 2019. *Id.* ¶ 211. On August 15, 2019, prior to her NOA's expiration, Richards sent Nicolini an email stating that Nicolini's employment was terminated on a "just cause basis" effective August 16, 2019. *Id.* ¶ 225.

Nicolini subsequently filed suit in Maricopa County Superior Court against Defendants. On September 15, 2020, Defendants removed the suit to this Court. (Doc. 1.) Nicolini's Second Amended Complaint alleges violation of Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"); violation of the Americans with Disabilities Act ("ADA"); violation of the FMLA; violation of the First and Fourteenth Amendments, pursuant to 42 U.S.C. § 1983; violation of the Arizona Civil Rights Act ("ACRA"); breach of contract; breach of the covenant of good faith and fair dealing; and intentional infliction of emotional distress ("IIED"). (Doc. 11.)

On December 7, 2020, the parties filed a joint stipulation to dismiss with prejudice Nicolini's FMLA retaliation claim and Fourteenth Amendment claim. (Doc. 14.) Accordingly, those claims are dismissed with prejudice. On December 8, 2020, Defendants filed this motion to dismiss, requesting that the Court dismiss the remainder of Nicolini's claims.

## DISCUSSION

### I. Legal Standard

To survive dismissal for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must contain more than a "formulaic recitation of the elements of a cause of action"; it must contain factual allegations sufficient to "raise the right of relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). When analyzing a complaint for failure to state a claim, "allegations of material fact are taken as true and construed in the light most favorable to the non-moving party." *Smith v. Jackson*, 84 F.3d 1213, 1217 (9th Cir. 1996). However, legal conclusions couched as factual allegations are not given a presumption of truthfulness, and "conclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss." *Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998).

### II. Analysis

#### A. Breach of Contract

The purpose of contract interpretation is to determine and enforce the parties' intent. *Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 152, 854 P.2d 1134, 1138 (1993). To determine intent, courts "look to the plain meaning of the words as viewed in the context of the contract as a whole." *United Cal. Bank v. Prudential Ins. Co.*, 140 Ariz. 238, 259, 681 P.2d 390, 411 (Ct. App. 1983). If the contract's terms are plain and unambiguous, its interpretation is a question of law for a court to decide. *Chandler Med. Bldg. Partners v. Chandler Dental Grp.*, 175 Ariz. 273, 277, 855 P.2d 787, 791 (Ct. App. 1993). However, where a contract's terms are reasonably susceptible to more than one meaning, the matter

is a factual question for the jury. *Taylor*, 175 Ariz. at 158–59, 854 P.2d at 1144–45.

### 1. Incorporation by Reference

An extrinsic document may be incorporated by reference into the body of a contract if the contract "clearly evidence[s] an intent that the writing be made part of the contract." *United Cal. Bank*, 140 Ariz. at 258, 681 P.2d at 410. No specific language is necessary to incorporate a document. *Id.* However, "[t]he reference must be *clear and unequivocal* and must be called to the attention of the other party, he must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties." *Id.* at 268, 681 P.2d at 420 (quoting 17A C.J.S. *Contracts* § 299 at 136 (1963)).

Nicolini alleges that ABOR breached the NOA by violating policies incorporated within the NOA. (Doc. 11 ¶¶ 332–42.) The Second Amended Complaint states that these policies include, but are not limited to, ABOR policies 1-119, 6-301, and 6-303; University Handbook for Appointed Personnel's ("UHAP") Chapter 2's Section 2.01 and Chapter 4's Introduction and Sections 4C.2.01 and 4C.4.03; Office of Institutional Equity's ("OIE") Policies and Procedures; and the U of A Policy on Nondiscrimination and Anti-harassment Policy. *Id.* ¶ 335. Nicolini's NOA states that "[t]his appointment is subject to and incorporates the provisions of *Arizona Board of Regents* (ABOR) *Policy Manual*, Policies 6-301 and 6-303, Conditions of Service for Academic and Service Professionals, and Chapter 4 of the *University Handbook for Appointed Personnel* (UHAP)." (Doc. 15–1 at 15.)[2] The "subject to" and "incorporate" language demonstrate a clear intent to make ABOR policies 6-301 and 6-303 and UHAP Chapter 4 part of the NOA. *See Indus. Comm. v. Ariz. Power Co.*, 37 Ariz. 425, 431, 295 P. 305, 307 (1931) (finding that the "subject to" reference to the plan in the contract was sufficient to incorporate it). ABOR policy 6-301 further communicates this intent by stating that "[e]ach notice of appointment for such

---

[2] Courts may consider documents attached to a motion to dismiss without converting the motion into one for summary judgment "if the attached document is: (1) central to the plaintiff's claim; and (2) undisputed." *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002). The NOA, and the other policies cited to in this Order, are mentioned in the Second Amended Complaint, are central to Nicolini's breach of contract and covenant of good faith and fair dealing claims, and are undisputed. Therefore, these documents may be properly considered in the context of this motion.

1 employees shall incorporate this policy by reference and shall provide that acceptance of
2 the notice of appointment is recognition that this policy constitutes the conditions of
3 employment." (Doc. 15–1 at 2); *see also Redhair v. Kinerk, Beal, Schmidt, Dyer & Sethi,*
4 *P.C.*, 218 Ariz. 293, 295, 183 P.3d 544, 546 (Ct. App. 2008) (referring to the Black's Law
5 Dictionary definition of employment contract, which defines the term as a "contract
6 between an employer and employee in which the terms and conditions of employment are
7 stated"). The fact that ABOR policy 6-301 refers to itself as a "policy" does not warrant a
8 different conclusion. (Doc. 15–1 at 2.)

ABOR policy 1-119 is also clearly incorporated into the NOA. ABOR policy 6-303(D)(1) states that "[a]ll employees are bound by Board Policies, which are considered to be part of their conditions of employment." (Doc. 18–1 at 3.) ABOR policy 1-119 is also specifically listed in ABOR policy 6-301's definition of discriminatory action. (Doc. 15–1 at 3.) The terms "part of their conditions of employment" evidence a clear intent for ABOR policy 1-119, which is a board policy, to be part of the NOA. The fact that this policy is not mentioned in the NOA itself does not preclude its incorporation. *See, e.g.*, *Weatherguard Roofing Co. v. D.R. Ward Const. Co.*, 214 Ariz. 344, 347, 152 P.3d 1227, 1230 (Ct. App. 2007) (finding that an arbitration provision, which was not directly referenced in the contract, was incorporated by reference through an extrinsic document that was directly referenced).

UHAP Chapter 2, Section 2.01, the OIE Policies and Procedures, and the U of A Nondiscrimination and Anti-harassment Policy, however, are not clearly incorporated into the NOA. The NOA states that appointment is subject to Chapter 4 of the UHAP but does not mention Chapter 2. (Doc. 15–1 at 15.) Other than alleging the contents of UHAP Chapter 2, Section 2.01, the Second Amended Complaint does not indicate how this section is connected to the NOA. Additionally, there is no clear intent in the NOA to incorporate the OIE or U of A policies. The NOA and ABOR policies reference university policy generally but do not specifically refer to OIE or U of A policies.

Defendants ague that "[a]s a legal entity under ABOR's jurisdiction and control, the

- 5 -

U of A cannot contractually bind ABOR beyond the agency that ABOR expressly gives it." (Doc. 15 at 5.) What this scope of agency is, however, is not a question appropriately decided on a motion to dismiss. Accordingly, Nicolini may rely on ABOR policies 6-301, 6-303, and 1-119 and UHAP Chapter 4 for her breach of contract claim but not UHAP Chapter 2, OIE's policies, or the U of A Nondiscrimination and Anti-harassment Policy.

### 2. Investigation

Nicolini plausibly alleges ABOR breached the NOA when the "OIE failed to act in a timely or reasonable manner in conducting its investigation." (Doc. 11 ¶ 338.) Although Nicolini may not rely on the OIE's policies to make this claim, ABOR Policy 1-119, which is incorporated into the NOA, states that ABOR "will take prompt and appropriate action" in investigating complaints. (Doc. 11 ¶ 51.) Contrary to Defendants' assertion, this claim does not fail due to lack of consideration or indefiniteness.

Adequate consideration for a contract "consists of a benefit to the promisor and a detriment to the promisee." *Carroll v. Lee*, 148 Ariz. 10, 13, 712 P.2d 923, 926 (1986). Here, Nicolini signed the NOA, which incorporates the provisions discussed above, in exchange for her annual salary. (Doc. 15–1 at 15.) Therefore, there is sufficient consideration for the NOA.

This claim also does not fail for indefiniteness. As the Arizona Supreme Court has found similarly broad language sufficiently definite, "prompt and appropriate action" is not vague enough to be unenforceable. *See Schade v. Diethrich*, 158 Ariz. 1, 11, 760 P.2d 1050, 1060 (1988) (finding a promise of "fair and equitable" severance benefits enforceable).

### 3. Non-Renewal Notice

Nicolini alleges that ABOR breached the NOA because "Defendant Ogden was not the proper person to sign the non-renewal notice as she was not the 'immediate administrative head or supervisor' of Ms. Nicolini." (Doc. 11 ¶ 333.) UHAP Chapter 4, Section 4C.4.01 states that the "immediate administrative head or supervisor may decide not to renew the appointment of any service professional employee." (Doc. 15–1 at 13.)

Neither this section nor any other policy that Nicolini points to mandates who must sign a non-renewal notice. Accordingly, as pled, this claim is dismissed.[3]

### B. Covenant of Good Faith and Fair Dealing

The covenant of good faith and fair dealing is implied in every contract. *See Wagenseller v. Scottsdale Mem'l Hosp.*, 147 Ariz. 370, 383, 710 P.2d 1025, 1038 (1985). "The duty arises by virtue of a contractual relationship. The essence of that duty is that neither party will act to impair the right of the other to receive the benefits which flow from their agreement or contractual relationship." *Rawlings v. Apodaca*, 726 P.2d 565, 569–70, 151 Ariz. 149, 153–54 (1986). A party violates this covenant if they "exercise[ ] discretion retained or unforeclosed under a contract in such a way as to deny the other a reasonably expected benefit of the bargain." *Sw. Sav. & Loan Assoc. v. SunAmp Sys., Inc.*, 172 Ariz. 553, 558, 838 P.2d 1314, 1319 (Ct. App. 1992).

Here, ABOR policy 1-119, incorporated into Nicolini's NOA, provides that "the board and the universities prohibit unlawful discrimination . . . based on . . . disability" and that "the board and universities will take prompt and appropriate action to . . . thoroughly investigate complaints." (Doc. 11 ¶ 51.) Nicolini alleges ABOR breached the covenant of good faith and fair dealing by not renewing her appointment for discriminatory reasons. *Id.* ¶¶ 345, 347. Nicolini also alleges ABOR breached the covenant when it took almost fourteen months for the investigation into her complaints of discrimination to be completed. *Id.* ¶ 237. As Nicolini plausibly alleges that ABOR deprived her of benefits provided to her in her NOA, Defendants' motion to dismiss this claim is denied.

### C. 42 U.S.C. § 1983: First Amendment Retaliation[4]

---

[3] Nicolini asserts that she never alleged there was a signatory requirement. (Doc. 18 at 5.) Nicolini may amend her Second Amended Complaint to reflect this assertion.

[4] The Second Amended Complaint alleges that Defendants retaliated against Nicolini because of her "(a) complaints of discrimination, harassment, and retaliation in violation of the law, (b) complaints about the U of A and supervisor level employees' failure to adhere to its policies or the law in reference to the prevention of workplace discrimination, harassment, and retaliation, and (c) complaints that a director level employee lacked competence and engaged in actions that constituted an abuse or waste of public funds, were all matters of public concern. *Id.* ¶ 308. During oral argument, Nicolini conceded that her allegations in (a) and (b) would not survive a qualified immunity defense and solely argued that her allegations in (c) establish a violation of clearly established law. Accordingly, to

- 7 -

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). "'Clearly established' means that, at the time of the officer's conduct, the law was 'sufficiently clear that every reasonable official would understand that what he is doing' is unlawful." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *al-Kidd*, 563 U.S. at 741). Although the Ninth Circuit does "not require a case directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Keates v. Koile*, 883 F.3d 1228, 1239 (9th Cir. 2018) (quoting *al-Kidd*, 563 U.S. at 741). "[I]n an obvious case, [highly generalized] standards can 'clearly establish' the answer, even without a body of relevant case law." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004).

At the motion to dismiss stage, determining claims of qualified immunity "raises special problems for legal decision making." *Koile*, 883 F.3d at 1234. "If the operative complaint 'contains even one allegation of a harmful act that would constitute a violation of a clearly established constitutional right,' then plaintiffs are 'entitled to go forward' with their claims." *Id.* at 1235 (citing *Pelletier v. Fed. Home Loan Bank of S.F.*, 968 F.2d 865, 872 (9th Cir. 1992)).

"The First Amendment shields a public employee if [s]he speaks as a citizen on a matter of public concern." *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1056 (9th Cir. 2013) (quoting *Anthoine v. N. Cent. Cntys. Consortium*, 605 F.3d 740, 748 (9th Cir. 2010)). A claim that a government entity impermissibly retaliated against a plaintiff for the exercise of her First Amendment rights requires the plaintiff to show that (1) she spoke on a matter of public concern, (2) she spoke as a private citizen (not as a public employee), and (3) her speech was a substantial or motivating factor in the adverse employment action. *Robinson v. York*, 566 F.3d 817, 822 (9th Cir. 2009). Nicolini plausibly alleges a violation of a clearly established right because no reasonable official, under the circumstances alleged,

---

the extent that Nicolini seeks monetary damages for the allegations in (a) and (b), the claim is dismissed.

- 8 -

would believe that Nicolini's comments did not involve matters of public concern or that she spoke as a public employee.[5]

"Speech involves a matter of public concern when it can fairly be considered to relate to 'any matter of political, social, or other concern to the community.'" *Johnson v. Multnomah Cnty.*, 48 F.3d 420, 422 (9th Cir. 1995) (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)). The Ninth Circuit has stated that "misuse of public funds, wastefulness, and inefficiency in managing and operating government entities are matters of inherent public concern." *Id.* at 425. Nicolini's comments fall directly within this category as she alleges that she was retaliated against for speaking about Patten's "lack of qualifications and competence for the position she held and mismanagement of grant efforts related to the arts and humanities which negatively affected the expenditure of public monies." (Doc. 11 ¶ 84.)

Regarding whether Nicolini spoke as a private citizen or public employee, "[a] public employee's speech is not protected by the First Amendment when it is made pursuant to the employee's official job responsibilities." *Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1071 (9th Cir. 2012). "Statements are made in the speaker's capacity as citizen if the speaker 'had no official duty' to make the questioned statements, or if the speech was not the product of 'performing the tasks the employee was paid to perform.'" *Eng v. Cooley*, 552 F.3d 1062, 1071 (9th Cir. 2009) (quoting *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1127 n.2 (9th Cir. 2008)). The scope and content of a plaintiff's job responsibilities are questions of fact, and the ultimate constitutional significance of those facts is a question of law. *Hagen v. City of Eugene,* 736 F.3d 1251, 1257 (9th Cir. 2013).

At oral argument, Nicolini argued that *Eng v. Cooley* demonstrates that Defendants violated a clearly established right. In *Eng*, the plaintiff, a deputy district attorney, was assigned to a task force, headed by Special Assistant Patchett, to investigate allegations of

---

[5] Defendants do not address whether Nicolini's allegations satisfy *Robinson*'s third requirement. Accordingly, the Court only analyzes whether Nicolini satisfies the first two requirements.

fraud related to the construction of a learning complex. 552 F.3d at 1064. After the investigation, the plaintiff attended a meeting and presented his findings to the District Attorney and his executive staff. *Id.* During this meeting, the plaintiff informed the group that certain agreements had been cancelled because "Patchett had improperly leaked to the IRS that the School District had committed fraud" in purchasing the learning complex and that "Patchett's contrary report to the IRS was 'wrong and should be rectified.'" *Id.* The plaintiff argued that he was retaliated against for speaking out about the IRS leak. *Id.* at 1066. In analyzing whether qualified immunity applied, the Ninth Circuit held that the plaintiff's version of the facts plausibly indicated he had no official duty to complain about a leak to the IRS and that he had a clearly established right to comment on the leak because it has long been the law of the land that when a plaintiff "comment[s] upon matters of public concern as a citizen and *not* pursuant to his job responsibilities, his speech [is] protected by the First Amendment." *Id.* at 1075–76 (internal citations and quotations omitted).

Here, Nicolini alleges that, as a Research Development Associate, her "primary responsibility was to cultivate extramural funding in arts, humanities, and social sciences; increase the breadth of U of A's funding agencies, grow the number of faculty and units (including centers and museums) submitting proposals to state and federal agencies, private foundations, and honors associations; and increase the funded proposals by dollar amount and total funded." (Doc. 11 ¶ 11.) Nicolini also met periodically with R. Brooks Jeffery, the Associate Vice President for Research, to discuss grants and funding. *Id.* ¶¶ 83–84. Jeffrey worked in the Office of Research, Innovation & Impact, which is in the RDI department. *Id.* ¶ 83. Nicolini alleges that she made her comments about Patten's mismanagement during meetings with Jeffrey. *Id.* ¶ 84.

Nicolini's allegations are sufficiently analogous to the facts in *Eng* to defeat qualified immunity at this stage in the proceedings. Like in *Eng*, although Nicolini's comments involved the same subject matter as her official duties, her job responsibilities did not encompass speaking out about mismanagement of superiors. *See also Dahlia v.*

*Rodriguez*, 735 F.3d 1060, 1075 (9th Cir. 2013) ("[I]f a public employee raises within the department broad concerns about corruption or systemic abuse, it is unlikely that such complaints can reasonably be classified as being within the job duties of an average public employee, except when the employee's regular job duties involve investigating such conduct."). Accordingly, Defendants' motion to dismiss Nicolini's First Amendment claim on qualified immunity grounds is denied. Defendants may reassert qualified immunity in a motion for summary judgment.

### D. Sovereign Immunity

"There are two forms of sovereign immunity: (1) sovereign immunity under the Eleventh Amendment, which bars federal lawsuits against states and (2) sovereign immunity under the broader doctrine of state sovereign immunity, which shields a state from liability in both federal and state court, unless it has consented to be sued." *Wood v. Mont. Dep't of Revenue*, 826 F. Supp. 2d 1232, 1234 (D. Mont. 2011) (collecting cases); *see also Fed. Mar. Com'n v. S.C. State Ports Auth.*, 535 U.S. 743, 753–54 (2002) ("[T]he Eleventh Amendment does not define the scope of the States' sovereign immunity; it is but one particular exemplification of that immunity. . . . [T]he sovereign immunity enjoyed by the States extends beyond the literal text of the Eleventh Amendment."). State immunity extends to an "arm of the state." *See, e.g.*, *Durning v. Citibank, N.A.*, 950 F.2d 1419, 1423 (9th Cir. 1991). Here, ABOR invokes immunity from Nicolini's ADA and FMLA claims under the broader doctrine of state sovereign immunity from liability. As ABOR is an "arm of the State of Arizona," *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 864 (9th Cir. 2016), sovereign immunity applies.

In her response to Defendants' motion to dismiss, Nicolini fails to address whether an exception to sovereign immunity applies. (Doc. 18 at 22.) Accordingly, Nicolini's ADA and FMLA claims against ABOR, and Patten, Richards, and Ogden, in their official capacities, are dismissed with prejudice to the extent that Nicolini seeks monetary damages. *See Frigard v. United States*, 862 F.2d 201, 204 (9th Cir. 1988) (upholding a district court's dismissal of an action with prejudice because "the bar of sovereign

immunity is absolute").

### E. FMLA Interference

An FMLA interference claim requires an employee to establish that "(1) he was eligible for the FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied him FMLA benefits to which he was entitled." *Sanders v. City of Newport*, 657 F.3d 772, 778 (9th Cir. 2011). The FMLA entitles employees to twelve weeks of unpaid leave for certain medical reasons. 29 U.S.C. § 2612(a)(1). "[A]n employee who takes FMLA leave has the right to be restored to his or her original position or to a position equivalent in benefits, pay, and conditions of employment upon return from leave." *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1132 (9th Cir. 2003) (citing 29 U.S.C. § 2614(a)). However, this right to job protection under the FMLA expires if the employee fails to return to work at the expiration of her FMLA leave. *See, e.g.*, *Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 764 (5th Cir. 2001) ("If Hunt did not attempt to return to work on or before her FMLA leave expired . . ., the Medical Center was no longer under an express statutory duty to reinstate her to her former position or to an equivalent position."); *Farina v. Compuware Corp.*, 256 F. Supp.2d 1033, 1054 (D. Ariz. 2003) ("Because Plaintiff took longer than 12 weeks leave, she is only entitled to an equivalent position under the FMLA if she was prepared to return to work during a time designated as FMLA leave.").

Nicolini alleges she exhausted her available FMLA leave at the end of November 2018. (Doc. 11 ¶ 100.) Prior to the end of her FMLA leave, Nicolini met with Richards and Patten to discuss her return to work, which was scheduled for December 3, 2018. *Id.* ¶ 104. Richards and Patten informed Nicolini that "she was expected to return to work full time and be '100%'" and that her "job would be at risk if she could not function at 100%." *Id.* ¶¶ 105, 107. Nicolini alleges that she was prepared to return to work by December 3 but decided to request more leave because of Richards and Patten's requirement that she be 100% upon her return. *Id.* ¶ 131. Nicolini returned from her additional leave on

December 21, 2018. *Id.* ¶ 150. She argues that, upon her return from leave, Defendants altered her conditions of employment in various ways. (Doc. 18 at 13.)

As Nicolini chose not to return to work after the exhaustion of her FMLA leave, she was not entitled to job protection under the FMLA when she returned. That Nicolini did not return because she was expected to be at 100% does not change the outcome. *See Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 384 (3d Cir. 2002) ("[A]n employer [is not required] to provide a reasonable accommodation to an employee to facilitate his return."). Accordingly, Nicolini's FMLA interference claim is dismissed.

## F. Rehabilitation Act, ADA, and ACRA

The Rehabilitation Act, ADA, and ACRA are interpreted according to the same legal standards. *Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999); *Rent A Ctr. v. Indus. Com'n of Ariz.*, 191 Ariz. 406, 409, 956 P.2d 533, 536 (Ct. App. 1998). Defendants allege Nicolini's disability claims fail because (1) she does not sufficiently allege the existence of a hostile work environment; (2) she cannot allege disability discrimination as she is not a qualified individual; (3) no statute requires ABOR to develop policies tailored to PTSD and CPTSD; (4) she fails to state a failure to accommodate claim; and (5) the statutes do not provide for individual liability. (Doc. 15 at 16–19.) The Court addresses each in turn.

### 1. Hostile Work Environment[6]

One of the required elements of a hostile work environment claim is that "the harassment was sufficiently severe or pervasive to alter the conditions of [ ] employment and to create an abusive working environment." *Wynes v. Kaiser Permanente Hosps.*, 936 F. Supp. 2d 1171, 1185 (E.D. Cal. 2013). A hostile work environment is one where "the workplace is permeated with discriminatory intimidation, ridicule, and insult." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citations and internal quotation marks omitted).

---

[6] Although the Ninth Circuit has yet to resolve the question of whether plaintiffs can bring a hostile work environment claim on the basis of disability, "every circuit to have done so has concluded that disability-based claims for hostile work environment are actionable under the ADA." *McIntyre v. Eugene Sch. Dist. 4J*, 976 F.3d 902, 916 (9th Cir. 2020). Accordingly, the Court will follow the holdings of these circuits.

Determining whether a hostile work environment exists requires examining "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 103 (2002).

Here, Nicolini alleges several occurrences created a hostile work environment, including that (1) Richards or Patten told her colleagues not to talk with her, resulting in her colleagues not acknowledging her, (Doc. 11 ¶ 145); (2) Richards and Patten called many meetings "with the goal of destabilizing Ms. Nicolini by exploiting her disability and causing her to make quick, panicked decisions[,]" *id.* ¶ 112; (3) Patten "coerced and bullied" Nicolini into working from home permanently with the goal to "entirely remove Ms. Nicolini from the workplace[,]" *id.* ¶ 193; (4) Patten yelled at Ms. Nicolini in a public place in front of Nicolini's colleagues while aware of Nicolini's PTSD, *id.* ¶ 175; and (5) Richards told Nicolini that she was "not to talk to anyone about what happened to [her] because [Richards] [didn't] want to hear it and no one else [did] either[,]" *id.* ¶ 142. Taking Nicolini's allegations as true, Nicolini alleges sufficient facts to support her hostile work environment claim.

### 2. Disability Discrimination

The Rehabilitation Act, ADA, and ACRA prohibit discrimination against qualified individuals. *See* 29 U.S.C. § 794; 42 U.S.C. § 12112(a); A.R.S. § 41–1463(O). A qualified individual is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1133 (9th Cir. 2001) (quoting 42 U.S.C. § 12111(8)). Essential functions are "fundamental job duties of the employment position . . . not includ[ing] the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). "Although the plaintiff bears the ultimate burden of persuading the fact finder that he can perform the job's essential functions . . . an employer who disputes the plaintiff's claim that he can perform the essential functions must put forth evidence

establishing those functions." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 991 (9th Cir. 2007) (quoting *EEOC v. Wal-Mart*, 477 F.3d 561, 568 (8th Cir. 2007)).

Here, Nicolini alleges she was "able to perform her essential job duties with or without a reasonable accommodation." (Doc. 11 ¶ 82.) She further alleges that, as of February 7, 2019, she had already been able to meet her goals for the year. *Id.* ¶ 169. Although Nicolini alleges difficulty completing her work, she associates this difficulty with Defendants' "on-going effort to set Ms. Nicolini up for failure," not her own abilities. *Id.* ¶ 196. Drawing all reasonable inferences in favor of the plaintiff, Nicolini plausibly alleges she is a qualified individual.[7]

### 3. Policies and Practices

Nicolini alleges that ABOR failed to provide sufficient policies and practices to address her disabilities. *Id.* ¶¶ 268, 286, 326. In her response to Defendants' Motion, Nicolini clarifies that this allegation relates to her assertion that ABOR failed to properly engage in the interactive process. (Doc. 18 at 18.) Accordingly, to the extent that Nicolini claims ABOR violated the Rehabilitation Act, ADA, and ACRA by not creating policies tailored to PTSD and CPTSD, those claims are denied.

### 4. Failure to Accommodate

"Once an employer becomes aware of the need for accommodation, that employer has a mandatory obligation under the ADA to engage in an interactive process with the employee to identify and implement appropriate reasonable accommodations." *Humphrey*, 239 F.3d at 1137. An employer who fails to participate in the interactive process in good faith "will face liability '*if a reasonable accommodation would have been possible*.'" *Snapp v. United Transp. Union*, 889 F.3d 1088, 1095 (9th Cir. 2018) (quoting *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1116 (9th Cir. 2000)). "[T]here exists no stand-alone claim for failing to engage in the interactive process. Rather, discrimination results from denying

---

[7] Defendants contend that working full-time was an essential function of Nicolini's role. (Doc. 15 at 18.) The Second Amended Complaint does not establish this. *See* (Doc. 11 ¶ 153) ("[Disability Resource Center] made no mention that working full-time was an essential job function."). Regardless of whether working full-time is an essential job function, Nicolini alleges she intended to return to work full-time but was prevented from doing so. *Id.* ¶ 202.

- 15 -

an available and reasonable accommodation." *Id.*

In addition to alleging failure to participate in the interactive process in good faith, Nicolini alleges that the Disability Resource Center "utterly failed to understand and accommodate Ms. Nicolini's disabilities." (Doc. 11 ¶ 327.) As Nicolini alleges discrimination resulting from the denial of a proper accommodation, Defendants fail to show that her failure to accommodate claim should be dismissed.

### 5. Individual Liability

Nicolini's claims under these statutes are not barred due to a ban on individual liability. First, Nicolini only brings her ACRA claim against ABOR. Second, the cases Defendants cite for the Rehabilitation Act and ADA deal with whether defendants may be sued in their *individual* capacity, not their *official* capacity. *Vinson v. Thomas*, 288 F.3d 1145, 1156 (9th Cir. 2002) (holding that a plaintiff cannot bring an action in her "individual capacity"); *Walsh v. Nev. Dept. of Human Resources*, 471 F.3d 1033, 1038 (9th Cir. 2006) ("The district court was correct when it held that individual defendants cannot be held personally liable for violations of the ADA."). As Nicolini brings her Rehabilitation Act and ADA claims against the individual defendants in their official capacities, these cases do not mandate dismissal.

## G. IIED

To establish IIED under Arizona law, a plaintiff must demonstrate that (1) the defendant's conduct was extreme and outrageous; (2) the defendant intended the emotional distress or "recklessly disregard[ed] the near certainty that such distress [would] result from his conduct[;]" and (3) severe emotional distress resulted from the defendant's conduct. *Ford v. Revlon, Inc.*, 153 Ariz. 38, 43, 734 P.2d 580, 585 (1987). Arizona has adopted the *Restatement* test for what constitutes extreme and outrageous conduct. *See Johnson v. McDonald*, 197 Ariz. 155, 160, 3 P.3d 1075, 1080 (Ct. App. 1999). The *Restatement* states:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to

>an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

Restatement (Second) of Torts § 46 cmt.d.  One relevant factor in determining outrageousness is a defendant's knowledge "that the plaintiff is peculiarly susceptible to emotional distress by reason of some physical or mental condition." *Lucchesi v. Frederic N. Stimmell, M.D., Ltd.*, 149 Ariz. 76, 79, 716 P.2d 1013, 1016 (1986).  "The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know." Restatement (Second) of Torts § 46 cmt.f.  Courts should not dismiss IIED claims "if reasonable minds could differ about whether the conduct is sufficiently outrageous[.]" *Johnson*, 197 Ariz. at 160, 3 P.3d at 1080.

Here, Nicolini alleges Defendants committed IIED when they "discriminated and retaliated against [her] because of her disabilities." (Doc. 11 ¶ 355.)  She alleges "Defendants Patten and Richards knew that verbal confrontation, yelling, unwarranted harsh criticism, arguments, aggressive behavior, a hostile working environment, ostracizing and other similar actions" would exacerbate her PTSD and CPTSD." *Id.* ¶ 103.

In her response to Defendants' Motion, Nicolini specifies that the following incidents form the basis of her IIED claim: (1) Defendants Richards and Patten told Nicolini that her job would be at risk if she did not return to work at 100%, *id.* ¶¶ 105–07; (2) Richards and Patten called several meetings "with the goal of destabilizing [Nicolini] by exploiting her disability and causing her to make quick, panicked decisions," *id.* ¶ 112; (3) Richards and Patten set an "unreasonable deadline" for Nicolini to provide a doctor's note, *id.* ¶¶ 115–26; (4) Richards or Patten "told Ms. Nicolini's colleagues not to talk with her," resulting in Nicolini's colleagues refusing to acknowledge her, *id.* ¶ 145; (5) Richards and Patten reduced Nicolini's work hours and required her to permanently work from home as a deliberate effort to isolate her, *id.* ¶¶ 156, 184–85, 191–94, 207, 220; (6) Patten assigned Nicolini a lengthy list of new tasks "to set Ms. Nicolini up for failure," *id.* ¶¶ 195–96, 203; (7) Patten scheduled a meeting for a time that conflicted with Nicolini's weekly

therapy meeting, *id.* ¶ 104; (8) Richards and Patten made decisions on accommodations without proper consultation, *id.* ¶¶ 133, 146, 159; (9) Patten told Nicolini in a letter that her employment "could potentially be terminated as a voluntary resignation" if she did not return to work by a certain date, *id.* ¶¶ 134–36; (10) Patten, in front of Nicolini's colleagues in a public space, yelled that she was "'fully unprepared' for the workshop and that [her] actions were 'unacceptable,'" *id.* ¶¶ 175–77; (11) Richards told Nicolini that she was "not to talk to anyone about what happened to [her] because [he] [didn't] want to hear it and no one else [did] either," *id.* ¶ 142–44; and (12) Ogden sent Nicolini an email with the subject line stating "URGENT REQUEST" and the body of the email stating "Available?" *id.* ¶ 223.

In light of Richards and Patten's awareness of Nicolini's PTSD and CPTSD, a reasonable mind could determine that the alleged conduct in (4), (5), and (11) is sufficiently extreme and outrageous. A reasonable mind could not, however, find the other conduct, as currently alleged, to constitute extreme and outrageous conduct. Therefore, Nicolini may only rely on the alleged conduct in (4), (5), and (11) for her IIED claim. Additionally, Nicolini's IIED claim is dismissed against Ogden, in her official and personal capacities, as the only allegation against her in (12) is not sufficiently extreme and outrageous to constitute IIED.[8] Accordingly,

**IT IS THEREFORE ORDERED** that the parties' Stipulation to Dismiss with Prejudice Plaintiff's FMLA Retaliation Claim under Count III and Fourteenth Amendment Claim under Count IV (Doc. 14) is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendants' Motion to Dismiss and Certification of Good Faith Consultation (Doc. 15) is **GRANTED** in part and **DENIED** in part as follows:

1. Nicolini may not rely on UHAP Chapter 2, OIE's policies, or the U of A Nondiscrimination and Anti-harassment Policy for her breach of contract claim. Her claim

---

[8] Defendants also argue there is no legitimate basis for naming individual defendants but do not provide authority on why this is impermissible. (Doc. 15 at 13–14.) Accordingly, the Court does not dismiss Nicolini's claims on those grounds.

that Ogden's signature on her non-renewal notice breached the NOA is dismissed without prejudice. The remainder of her breach of contract claim remains.

2. Defendants' Motion is denied as to Nicolini's covenant of good faith and fair dealing claim.

3. Nicolini's 42 U.S.C. § 1983 First Amendment retaliation claim is dismissed without prejudice to the extent that it seeks monetary damages for the allegations in (a) and (b) in paragraph 308 of the Second Amended Complaint. Defendants' Motion for qualified immunity is denied.

4. Nicolini's FMLA interference claim, to the extent that it seeks monetary damages, against ABOR, and Patten, Richards, and Ogden, in their official capacities, is dismissed with prejudice. The claim is dismissed without prejudice against Patten, Richards, and Ogden, in their individual capacities, and to the extent that the claim seeks non-monetary damages.

**5.** Nicolini's ADA claim, to the extent that it seeks monetary damages, against ABOR, and Patten, Richards, and Ogden, in their official capacities, is dismissed with prejudice. The claim is dismissed without prejudice to the extent that the claim seeks non-monetary damages and to the extent that Nicolini claims ABOR violated the ADA by not creating policies tailored to PTSD and CPTSD. The remainder of her ADA claim remains.

6. Defendants' Motion is granted as to Nicolini's Rehabilitation Act and ACRA claims to the extent that Nicolini claims ABOR violated the acts by not creating policies tailored to PTSD and CPTSD. The remainder of her claims remains.

7. The conduct in (1), (2), (3), (6), (7), (8), (9), (10), and (12), as alleged, are not sufficiently extreme and outrageous to constitute IIED. Nicolini may rely on the alleged conduct in (4), (5), and (11) for her IIED claim. Nicolini's IIED claim is also dismissed against Ogden in her official and personal capacities.

Dated this 23rd day of April, 2021.

_G. Murray Snow_
G. Murray Snow
Chief United States District Judge